**UNITED STATES of America**

v.

**Frederic W. TOKARS, a/k/a Fred Tokars, James H. Mason, Anthony A. Brown, a/k/a Al Brown, Jessie H. Ferguson, a/k/a Todd Love Mitchell, a/k/a Todd Love, a/k/a Mitch Love, a/k/a Mitchell Lovett, Aaron Hudson, Alex W. Yancey, and William R. Carter, a/k/a Billy Carter.**

**Crim. A. No. 1:93–CR–357–ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 15, 1993.

---

Wilmer Parker, III, Lead Asst. U.S. Atty., Katherine B. Monahan, Asst. U.S. Atty., Atlanta, GA, for Government.

Bobby Lee Cook, Cook & Palmour, Summerville, GA, James J. Froelich, McKenney & Froelich, Jay Lester Strongwater, Strongwater & Cherniak, Atlanta, GA, for Frederic W. Tokars.

Kevin R. Brehm, Mildred Hankins Geckler, Federal Defender Program, Atlanta, GA, for James H. Mason.

Drew Findling, Office of Drew Findling, Atlanta, GA, James L. Feinberg, Office of James L. Feinberg, Detroit, MI, for Jessie H. Ferguson.

### ORDER

ORINDA D. EVANS, District Judge.

This criminal case is before the court on objections of Defendants Tokars, Mason and Ferguson to the Report and Recommendation of Magistrate Judge Joel M. Feldman filed November 19, 1993. The Report and Recommendation ("R & R") recommends that the Defendants' motions for change of venue be denied. The R & R determined that pretrial publicity surrounding the instant case has saturated the greater Atlanta community. However, it also finds that pretrial publicity has not been so prejudicial and inflammatory that it should be presumed that a potential jury panel would be prejudiced against the Defendants. Therefore, it is recommended that the court defer ruling on Defendants' motions pending voir dire of prospective jurors.

A hearing was held on December 2, 1993, before the undersigned for purposes of oral argument and to receive certain supplementary evidence tendered by Defendant Mason, reflecting the results of a poll conducted by the Center for Urban Policy Research at Georgia State University. The testimony of Gary T. Henry, Director of the Center was heard and the written poll results were admitted into evidence. Defendants Tokars, Mason and Ferguson presented their arguments urging the court to grant a change of venue.

■ Briefly stated, this case involves allegations of racketeering, money laundering, drug conspiracy, and various acts of violence including an alleged interstate telephone call to procure the murder of Sara Tokars and the attempted murder of Michael H. Jones. Defendant Tokars is an Atlanta tax and criminal defense attorney who formerly was an Assistant District Attorney. The indictment alleges that he served as the attorney for a

criminal enterprise which distributed cocaine and laundered the drug money through night clubs incorporated by Tokars and also through businesses established by Defendant Tokars for his business associate Eddie Lawrence. Defendant Tokars allegedly invested drug money in offshore bank accounts. Defendant Mason is a local businessman who allegedly served as a front for the drug dealers who purportedly were the true owners of the night clubs. Defendant Mason was Defendant Tokars' client. Defendant Ferguson allegedly supplied drugs to the enterprise and tortured and tried to kill Michael Jones who was believed to have taken some of the enterprise's money.

It is alleged that Lawrence hired a hit man to kill Defendant Tokars' wife Sara at Tokars' request. Mrs. Tokars was in fact shot and killed on November 29, 1992. The government's theory is that Sara Tokars' murder was arranged because she had become too knowledgeable about her husband's purported criminal activities and posed a threat to the continued vitality of the enterprise. Defendant Lawrence has pled guilty to aiding in the murder of Sara Tokars in state court and has pled guilty in this court to committing a violent crime in aid of racketeering activity, *i.e.*, the kidnapping and murder of Sara Tokars. Defendant Lawrence states that he hired a hit man, Curtis Rower, at the behest of Defendant Tokars and in the expectation of a large payment from Tokars.

Based on statements of defense counsel, Tokars' contention is that he was not aware that the night clubs were involved in any illegal activity, that he did not knowingly launder any drug money and that he had no part in arranging for his wife's murder. It appears that Mason's defense will be that he did not knowingly participate in any illegal activity. The theory of Ferguson's defense has not been stated at this time.

For the reasons set out in this order, Defendants' motions for change of venue are GRANTED and the instant case will be transferred to the Northern District of Alabama for jury selection and trial.

Defendants' motions are made under Rule 21(a) of the Federal Rules of Criminal Procedure. That rule provides in pertinent part that transfer of venue shall be granted on the defendant's motion "if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district." Fed.R.Crim.P. 21(a).

The landmark fair trial/free press cases emanating from the United States Supreme Court all involved state trials. *See Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); and *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). The seminal Supreme Court decision involving this issue in a federal trial, *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (per curiam), states the existence of Supreme Court supervisory power to formulate standards pertinent to cases of prejudicial publicity occurring during a trial, but does not elucidate general standards. *Marshall* does recognize that a federal trial judge has "a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial." *Id.* at 312, 79 S.Ct. at 1173. The supervisory power of the Supreme Court in setting standards for change of venue in publicized federal cases was recognized but not applied in *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). The Court found that the supervisory power did not apply to state habeas cases such as *Murphy. Id.* at 798, 95 S.Ct. at 2035. Instead, the Court applied constitutional due process standards. *See also id.* at 804, 95 S.Ct. at 2038 (Burger, C.J., concurring) ("I would not hesitate to reverse petitioner's conviction in the exercise of our federal supervisory powers, were this a federal case . . .,"); *Rideau,* 373 U.S. at 728, 83 S.Ct. at 1420 (Clark, J., dissenting) (disagreeing with the majority's determination that due process required reversal of defendant's conviction on account of prejudicial publicity, but stating that reversal would be warranted if

the case had arisen in a federal trial court); *United States v. Williams,* 523 F.2d 1203, 1209 n. 11 (5th Cir.1975) (noting the existence of an unresolved issue as to whether the trial judge's discretion on a Rule 21 motion is more restrictive than that involved in due process review but finding it unnecessary to address issue); *Issacs v. Kemp,* 782 F.2d 896, 897 (11th Cir.1986), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986) (Hill & Fay, JJ., dissenting) (dissenting from denial of rehearing en banc and stating, "Were we considering these cases on direct appeal from convictions in a federal court, I have little or no doubt that, in the exercise of our supervisory power, they should be reversed."); *United States v. Haldeman,* 559 F.2d 31 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977) (MacKinnon, J., concurring in part and dissenting in part) (noting that federal supervisory standards should apply to review of pretrial publicity issue in addition to constitutional due process standard); *United States v. Faul,* 748 F.2d 1204 (8th Cir.1984), *cert. denied,* 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 632 (1985) (Lay, C.J., dissenting) (noting that federal supervisory standards should apply to issue of pretrial publicity, not due process standard).

At the present time, *Marshall* is still binding precedent, although the contours of the holding are unclear. The court has been unable to locate any Eleventh Circuit decision which resolves or clarifies the differences or the applicability of the two foregoing strands of authority to a federal trial. However, there are a number of relatively recent Eleventh Circuit opinions where the constitutional standard of *Murphy* has been applied in reviewing and affirming convictions in a federal court. *See, e.g., United States v. De La Vega,* 913 F.2d 861, 865 (11th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2011, 114 L.Ed.2d 99 (1991); *United States v. Lehder–Rivas,* 955 F.2d 1510, 1523–25 (11th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 347, 121 L.Ed.2d 262 (1992). In *Lehder–Rivas,* the appellant's argument concerning the trial court's failure to properly exercise its supervisory powers was rejected in a footnote: "A trial court is required to exercise such power in extraordinary circumstances not presented by this case." *Id.* at 1525–26 n. 15. Based on the foregoing authority, the court finds that Defendants' motions should be reviewed under the constitutional standard of *Murphy v. Florida* and also under the supervisory standard of *Marshall v. United States.*

In its argument against the motions for change of venue, the government has focused on a recent Eleventh Circuit opinion, *Devier v. Zant,* 3 F.3d 1445 (11th Cir.1993), in which the Court of Appeals denied a petition to set aside a state conviction in a case involving the rape and murder of a 12 year old girl. The trial court had denied a motion for change of venue based on pretrial publicity. In *Devier,* the Court held that due process did not mandate change of venue on account of the admittedly extensive media coverage of the case, because petitioner had failed to show that the pretrial publicity was so prejudicial and inflammatory that prejudice of the potential jury pool should be presumed. *Devier* holds that a movant seeking change of venue based on claims of presumed prejudice must show *both* that the community was saturated with pretrial publicity and that the publicity was prejudicial and inflammatory. *Id.* at 1461. In the *Devier* case, the Court of Appeals found that the pretrial publicity was "essentially factual and was not directed at arousing or inciting the passion of the community." *Id.* at 1462.

The Magistrate Judge found, and the court agrees, that the Northern District of Georgia has been saturated with publicity about the instant case, with the greatest concentration of publicity having occurred between the murder of Defendant Tokars' wife Sara Tokars on November 29, 1992, and Defendant Tokars' arrest on August 25, 1993. During this time frame, the local newspaper articles and local television reports literally have numbered in the thousands. While the initial coverage dealt primarily with the circumstances of Sara Tokars' death, subsequent coverage beginning in approximately January, 1993, increasingly focused on the possibility and then the implicitly asserted probability that Tokars had been instrumental in arranging for his wife's murder. Some of this coverage suggested that Defendants To-

kars and Mason had ties to mobsters in Detroit, Michigan. After Tokars was indicted in the Superior Court of Cobb County, Georgia for first degree murder and indicted in this court on racketeering, money laundering and drug conspiracy charges, an additional intense round of media reports followed. Both the state and federal cases have been followed closely by the media, which has covered virtually all formal and informal proceedings in these cases. The undersigned does not recall a case in the Northern District of Georgia in recent years which has received the level of local publicity (*i.e.*, within the Atlanta media market[1]) as have the instant case and the state *Tokars* case. The purely local pretrial publicity in this case may in fact be greater than that involved in *United States v. Moody*, which involved the mail bomb deaths of Eleventh Circuit Court of Appeals Judge Robert S. Vance and civil rights attorney Robert E. Robinson. *See United States v. Moody*, 762 F.Supp. 1485 (N.D.Ga.1991) (granting unopposed motion for change of venue based on pretrial publicity).

The government argues and the Magistrate Judge found that while the publicity in the instant case has been pervasive, the great majority of the reporting has been essentially factual and thus not of the type necessary to support a change of venue. The court has reviewed all of the materials submitted by the parties consisting primarily of newspaper articles and video tapes of TV coverage concerning the case, both before and after the indictment. Resolution of the question whether the publicity was "prejudicial and inflammatory" in nature depends on what is meant by that terminology. Naturally, the very news that an individual is a suspect in a criminal case or that he has been indicted is negative, and therefore one might argue prejudicial. This clearly is not what is intended by *Devier* or similar cases, however. Neither do news accounts as to the status or progress of an investigation, what is contained in an indictment, or which merely state what occurred at various pretrial court proceedings constitute the type of prejudicial

and inflammatory coverage envisioned by *Devier*.

What makes this case unusual is the large amount of investigative reporting which was undertaken by the local media—particularly local television stations, during the approximately eight month time frame preceding Mr. Tokars' indictment. The great bulk of this reporting was quite negative to Mr. Tokars and the court does not know whether, or to what extent various allegations which surfaced in the investigative reports will even be reflected in the government's evidence at trial. For example, an individual was interviewed on at least one television station who claimed that Defendant Tokars had tried to hire him to kill Sara Tokars. This is a different person from the now-indicted self-confessed "hit man." A viewer of this coverage could well conclude that this individual's statements tend to corroborate the government's theory that Mr. Tokars hired someone to kill his wife. Yet the indictment does not reference any attempt by Defendant Tokars to hire the person who was interviewed, and this purported incident has never been mentioned in any pretrial proceedings. Similarly, television reporters have interviewed individuals who claim Sara Tokars told them that she feared for her life and that her husband was involved in illegal activity. The emotional impact of these television interviews is strong, arguably meeting the "prejudicial and inflammatory" standard of *Devier*.

Using a quantitative approach, the court agrees with the Magistrate Judge that the great bulk of the pretrial publicity in this case is factual, *i.e.*, not inflammatory in nature. However, combining the extraordinary volume of coverage (virtually all of which is highly negative to the Defendants) with the emotional nature of some of the coverage, one may infer that a widespread bias exists which could interfere with a fair trial. Two telling pieces of evidence before the court tend to reinforce this inference. Radio station WKLS ("Atlanta's 96 Rock") has broadcast this song:

TOKARS IS A POMPUS YUPPIE CLOWN

---

1. The greater Atlanta media market includes all divisions of this district within which juries could be selected and extends into the Middle District of Georgia.

HE CALLED HIS BUDDY LAW-RENCE

HE CALLED HIS BUDDY CURTIS

AND TOGETHER, THEY BROUGHT HIS WOMAN DOWN

TOKARS, TOKARS IS MADE OF MONEY

HE PAID A LOT THEY SAY

HE SPENDS HIS DAYS A COUNTIN'

THE MINUTE HE'S A FREE MAN IN THIS STATE

HE WAS BOUND TO SCREW IT UP SOON

AND ON TURKEY DAY

WHEN THE KIDS ARE IN THE TOYO-TA

AND THEIR MOM IS GONE

TELL ME WHAT YOU TOLD THE KIDS THAT DAY

**CHORUS:**

AND HE SHALL BE TOKARS

AND HE SHALL BE ARRESTED

AND HE SHALL BE TOKARS

IN TRADITION WITH THE REST OF THEM

AND HE SHALL BE TOKARS

AND HE SHALL BE ARRESTED

HE SHALL BE TOKARS

TOKARS SELLS HIS JUSTICE ACT DOWNTOWN

VACATIONS ALL THE TIME

JESUS, HOW CAN YOU SLEEP AT NIGHT

WITH BEING CAUGHT CONSTANT-LY ON YOUR MIND

AND JESUS, YOU WANT TO GO TO FLORIDA

TO LEAVE THIS ALL FAR BEHIND

TAKE ATAVAN AND GO SAILING

WHILE HE IGNORES THE KIDS A SECOND TIME

HE WAS BOUND TO SCREW IT UP SOON

AND ON CHRISTMAS DAY

WHEN THE KIDS ARE AT THEIR GRANDMA'S HOUSE

AND YOUR DRUGS ARE GONE

TELL ME HOW YOU'LL SCARE THE KIDS TODAY

The November 6, 1993 edition of Creative Loafing (a free weekly Atlanta newspaper) announced the "Best of Atlanta 1993." Mr. Tokars was purportedly selected by the readership as "Best" in the following categories: Local Villain, Scandal, Kept Secret and Over-Hyped Media Event. The significance of these bits of cynical humor is that they assume public awareness and acceptance of Mr. Tokars' guilt.

The Defendants' claims of pervasiveness of publicity and prejudicial effect of publicity are aided by the survey results which are in evidence. A random poll of 998 individuals in the Northern District of Georgia which was conducted by the Georgia State University Center for Urban Policy Research indicates that 69% of the respondents have heard or read "a great deal" regarding the death of Sara Tokars; 17.1% have heard "a fair amount." 66.6% of the respondents have an opinion based on what they have read or heard as to the guilt or innocence of Mr. Tokars in relation to the murder charges; 97.9% of those who have an opinion believe Mr. Tokars is guilty. Regarding the federal racketeering, money laundering and drug charges against Mr. Tokars and the other Defendants, 39.7% of the respondents have heard or read "a great deal" and 32.5% have heard or read "a fair amount." Of those who are familiar with the case, 53.3% have formed an opinion as to Mr. Tokars' guilt or innocence; 99% of those who have formed an opinion believe he is guilty of the federal charges. As regards the federal charges against the other Defendants, 44.1% of those who have been exposed to pretrial publicity have formed an opinion as to the guilt or innocence of those Defendants; 98% of those who have formed an opinion believe the other Defendants are guilty. While the survey may be faulted for failing to include a question as to whether the respondents would be able to be fair and impartial notwithstanding their exposure to pretrial publicity, it nonetheless stands as evidence which weighs in favor of Defendants' motion for change of venue.

The strongest argument against a finding of presumed prejudice sufficient to warrant transfer of this case to another venue is the fact that the Northern District of Georgia contains Atlanta, Georgia—a very large metropolitan, populous city. Even the Defendants' own poll reveals that at least 30% of the citizenry have no opinion whatsoever about this case. Therefore, it does not take a sophisticated mathematician to figure out that sufficient unbiased jurors exist in the Northern District of Georgia from which to select a jury panel. Of course, the difficult task would be ascertaining which prospective jurors in fact are unbiased. Where the negative publicity has been so intense, the court's task would be made more difficult by prospective jurors' subconscious recollection of news coverage.

Having analyzed the foregoing factors, the court finds that it is a close question whether a sufficient presumption of prejudice exists to constitutionally mandate a change of venue, but nonetheless determines that an adequate showing has been made based on a combination of the evidence of pretrial publicity and the poll results.

Turning to an alternative analysis of the motions for change of venue under the principles of the *Marshall* case, the court similarly finds that a change of venue should be granted. The decision on this basis is not a close one. Given the extraordinary degree of pretrial publicity, the difficulty of identifying truly unbiased jurors, the inconvenience of rescheduling the trial should voir dire prove unsuccessful in identifying unbiased jurors, and the availability of a relatively convenient, suitable alternative venue in Birmingham, Alabama, the court finds that change of venue prior to attempting jury selection is clearly warranted. In this regard, Birmingham is close enough to Atlanta (150 miles) so that it will not be unduly inconvenient for the large number of trial witnesses (most of whom are from the Atlanta area) and the change will not unduly burden the parties with additional expense. Courtroom facilities and adequate security are available at the federal courthouse in Birmingham. The Northern District of Alabama offers a jury pool which is very similar in demographic profile to that of the Northern District of Georgia. Also, while Birmingham has a smaller population than Atlanta's, it is nonetheless similar enough to Atlanta in its metropolitan, cosmopolitan aspects to make it a suitable substituted venue. The court has considered the fact that transferring the case to Birmingham will result in a de facto severance of the case against Defendant Hudson but deems that insufficient reason to choose other venues or to try the case in Atlanta. In summary, with only a relatively small amount of inconvenience attendant to transferring the case to Birmingham, the risk of prejudice to the Defendants can be avoided and the trial can proceed with greater efficiency.

■ In determining an appropriate alternative site for the trial, the court has considered the Defendants' requests for a venue outside the Eleventh Circuit or alternatively, for a trial in Miami, Florida. The evidence in this case does not warrant a transfer of this case out of the Eleventh Circuit. While there has been some nation-wide coverage in newspapers and magazines and also on nationally broadcast television programs, the coverage outside the Atlanta media market has been significantly less than Atlanta's and has been reasonably uniform. In other words, there is no reason to think that individuals in San Francisco, California or New York City have had less exposure to this case than have persons in Birmingham, Alabama, Jacksonville, Florida or Savannah, Georgia. Miami, Florida is a site too distant from Atlanta, with a dissimilar jury pool profile. The expense and inconvenience of moving this case to Miami is simply not warranted.

In summary, the Report and Recommendation is ADOPTED IN PART and REJECTED IN PART. The motions for change of venue of Defendants Tokars, Mason and Ferguson are GRANTED. The instant case (as to those Defendants) will be transferred to the Northern District of Alabama for jury selection and trial, which will occur at the Robert S. Vance Federal Courthouse in Birmingham, Alabama.

SO ORDERED.